FILED

2016 Mar-21  PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRETT and JESSICA LAFERRERA, | ) ) ) | |
| Plaintiffs; | ) ) | 7:15-cv-00473-LSC |
| vs. | ) ) ) | |
| CAMPING WORLD RV SALES OF BIRMINGHAM, THOR MOTOR COACH, INC. | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

Plaintiffs Brett and Jessica LaFerrera (the "LaFerreras") sued Defendants Emerald Coast RV Center LLC d/b/a Camping World RV Sales ("Camping World") and Thor Motor Coach ("Thor") because of alleged defects in a motor home manufactured by Thor and sold by Camping World. The LaFerreras claim revocation of acceptance, misrepresentation, concealment of defects, breach of warranty, and violation of the Magnuson-Moss Warranty Act ("MMWA"). The LaFerreras and Defendants each filed motions for summary judgment. For the reasons stated below, Defendants' motion is due to be GRANTED in part and DENIED in part, and the LaFerreras' motion is due to be DENIED. The

LaFerreras additionally filed a Motion to Preclude Defendants' Argument because of spoliation, and Defendants filed a Motion to Strike the Motion to Preclude. The LaFerreras' Motion is due to be DENIED. Therefore, Defendants' Motion is MOOT.

## I.   BACKGROUND

Brett and Jessica LaFerrera purchased a Palazzo motor home in October 2013 from Camping World. The Palazzo line of motor homes was manufactured by Thor. While using the Palazzo, the LaFerreras experienced repeated problems with it, and they discussed trading it in for a different model. They largely dealt with Steve Schriver, who was the general manger of Camping World at the time, but they also spoke with Phil Houser of Thor during the trade-in process. The parties eventually agreed that the LaFerreras would trade the Palazzo for a Tuscany model motor home, which was also manufactured by Thor. Thor gave Camping World $5,000 to facilitate the trade-in and to obtain a release of liability for any claims related to the Palazzo.[1] In exchange for facilitating the trade-in, the LaFerreras signed a release of liability for any claims arising from the Palazzo. The LaFerreras did not know at the time that Thor's contribution was related to obtaining the release.

---

[1] The LaFerreras knew that Thor was providing assistance to Camping World, but they did not know the specific amount.

Thor provided a written one year limited warranty on the Tuscany beginning on October 31, 2013.[2] The notice of the written warranty included a disclaimer, displayed in all capital letters, of all implied and express warranties. It also exclusively limited the LaFerreras' remedies to the repair or replacement of any defects at the expense of Thor, and if that remedy failed, then the LaFerreras would be entitled to diminution in value damages. Further, the warranty required that any action to enforce the warranty be brought within ninety days of the expiration of the one year warranty period. At some point during the trade-in process, a Camping World employee showed Brett LaFerrera a brochure that contained a statement that the motor home passed Thor's "Gold Star Inspection," which was described as an extensive inspection of its major components. The LaFerreras claim that this Gold Star Inspection and Camping World's explanation of it warranted that the Tuscany would be defect free.

Camping World and the LaFerreras entered into a sales agreement that was separate from the warranty provided by Thor. This agreement stated that Camping World sold the Tuscany "'AS IS', WITH NO EXPRESS OR IMPLIED WARRANTIES." (Doc. 62-14 at 2). It also stated,

> I UNDERSTAND THAT THE IMPLIED WARRANTIES OF
> MERCHANTABILITY AND FITNESS FOR A PARTICULAR

---

[2] Some components are covered by a two year warranty, but they are not at issue.

PURPOSE AND ALL OTHER WARRANTIES EXPRESS OR IMPLIED ARE EXCLUDED BY YOU FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE GOODS SOLD.

(Doc. 62-14 at 3). Moreover, the agreement contained a merger clause that said the written document contained the entire agreement between the parties. It—along with an acknowledgement of receipt of warranty document provided by Thor—also stated that the Tuscany had eight miles on its odometer. However, Defendants have admitted that the mileage was actually closer to 800 miles because it was driven from Indiana to Alabama after manufacturing. Regardless, they contend that the odometer always showed the correct mileage. Brett LaFerrera insists he saw the number eight on the odometer when he purchased the Tuscany and did not know that it was driven from Indiana to Alabama.

Following the purchase, the LaFerreras experienced several problems with the Tuscany. The motor home would lose electrical power sporadically, specifically in the dash control panel. The washing machine and dishwasher did not drain. The windshield was cracked and would leak, and the heat and air conditioning failed at times. The motor home vibrated because of alignment issues, and one of its TVs was scratched.[3] The Tuscany experienced some of these issues, particularly water leaks and electrical problems, during Thor's inspection of the unit during

---

[3] These are not all of the problems the LaFerreras had with the Tuscany.

manufacturing. Thor claims to have repaired the problems before it delivered the Tuscany to Camping World. However, because the LaFerreras experienced problems with the Tuscany, they returned the motor home to Camping World on November 9, 2013, December 5, 2013, March 12, 2014, and April 9, 2014 for repairs. According to the LaFerreras, some of the problems were fixed, but others, including the electrical problems, persisted, even though Camping World would assure the LaFerreras that the problems were fixed. In May of 2014, employees from Camping World and Thor emailed back and forth about who was handling these problems with the LaFerreras' Tuscany. The LaFerreras allege that Defendants failed to produce parts of this email conversation.[4]

On June 19, 2014, the LaFerreras agreed to release both Thor and Camping World:

> from any and all contract, warranty, equity and statutory claims, demands, administrative proceedings and lawsuits of any kind arising prior to the date this letter agreement is signed relating to your purchase, ownership and use of the [Tuscany], including any claims based upon prior warranty repairs and the time taken to complete the same.

(Doc. 62-17 at 2) (release executed on June 19, 2014). In exchange for the release, Thor provided the LaFerreras a one year warranty beginning November 1, 2014, the day after the original warranty expired.  The release does not address the

---

[4] The contents of the emails and the LaFerreras' allegations are detailed below.

Tuscany, other than as stated above. It also does not mention what Thor or Camping World knew about the Tuscany's problems. Further, the LaFerreras have not provided any parol evidence concerning any other relevant representations made at or about the time of the release.

The LaFerreras continued to have problems with the Tuscany. On July 31, 2014, Brett LaFerrera sent an email to Phil Houser of Thor, Chris Wathey of Camping World, and Steve Schriver of Camping World in which he listed eleven specific complaints.[5] Thor transported the Tuscany to Indiana to perform the repairs in September 2014. Thor claims to have repaired all of the problems. In addition, Thor contracted a Freightliner Service Center to fix the electrical problems with the dash control panel. Although it could not replicate the electrical failure, the Freightliner Service Center replaced the dash control panel but did not keep the removed dash panel. Thus, it could not be produced in discovery. During the repairs, Thor employees made entries into a unit history file, as well as maintaining a series of documents[6] pertaining to the repairs. Defendants produced the unit file but not the other documents in discovery. Although they never moved

---

[5] 1. Washing machine would not drain; 2. Dishwasher would not drain; 3. Microwave needed replacing because of recall; 4. Electrical power failure; 5. Pull out, drivers side would not open; 6. Cracked windshield; 7. Pull out, passenger side hit wall; 8. Front drawer would not stay shut; 9. Ceiling fan knob was broken; 10. Pull out, driver's side damaged mirror and scraped wallpaper; 11. Back bathroom door stuck.

[6] The LaFerreras refer to the documents as a "folder of information."

to compel Defendants to produce the documents, the LaFerreras claim that they were spoliated in a motion filed with this Court. In response to this motion, Defendants produced the documents, which largely consist of physical notes about the repairs that were made.

Thor returned the Tuscany to the LaFerreras on October 6, 2014, and Brett LaFerrera stated that someone from Thor or Camping World told him they could not identify and fix the electrical failure with the dash control panel. Two days later, on October 8, 2014, Brett LaFerrera drove the Tuscany from Alabama to Dixie Motors in New Orleans, Louisiana and traded it for a different RV made by a different manufacturer. Although Brett LaFerrera stated that some of the problems were not fixed, he did not experience any problems while driving the Tuscany to New Orleans. The LaFerreras filed this lawsuit on March 20, 2015.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine where there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

The LaFerreras allege eight counts in their Complaint regarding the Tuscany: (1) Revocation of Acceptance and Nonconformity, (2) Misrepresentation During Sale, (3) Concealment of Nonconformities and Defects, (4)

Misrepresentation During Repair Attempts, (5) Breach of Express Warranties, (6) Breach of Implied Warranty of Merchantability, (7) Breach of Implied Warranty of Fitness for a Particular Purpose, and (8) MMWA. They further allege that Defendants spoliated various pieces of evidence.

### A. Revocation of Acceptance

Defendants argue that the LaFerreras' revocation of acceptance claim fails as a matter of law. The LaFerreras did not respond to this argument, and they did not mention revocation of acceptance in their own motion for summary judgment. Generally, "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see also Road Sprinkler Fitters Local Union NO. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) ("[The court] could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."). Because the LaFerreras did not pursue their revocation of acceptance claim either in response to Defendants' motion or in their own motion for summary judgment, the Court will treat that claim as abandoned and dismiss it.

Even if the LaFerreras did not abandon their revocation of acceptance claim, it would otherwise fail. When buyers receive nonconforming goods, they may

revoke their acceptance if the nonconformity substantially impairs the goods' value to the buyer and the nonconformity was difficult to discover before acceptance. Ala. Code § 7-2-608. However, a buyer must provide the seller notice of revocation before it is effective. *See id.* The LaFerreras have not presented any evidence that they notified Defendants that they were revoking their acceptance prior to selling the Tuscany to a dealership in New Orleans. Their Complaint states that they notified Defendants of defects and nonconformities soon after delivery, but they have not provided evidence that they notified Defendants that they intended to revoke acceptance or otherwise return the Tuscany. In fact, the LaFerreras took the Tuscany in for repairs multiple times after delivery and retrieved it after the repairs were made, or at least attempted. These actions do not indicate that they did not want the Tuscany or intended to revoke their acceptance. Accordingly, even if the LaFerreras did not abandon their claim, they have not otherwise presented evidence to create a genuine issue of material fact.

### B. Spoliation

The LaFerreras argue that Defendants spoliated four items of evidence: (1) an email, (2) an electric dash control panel removed from the Tuscany, (3) a "folder of information" accompanying the unit history file for the Tuscany, and (4) "sealed documents" relating to the Tuscany's inspection process. Although

Alabama recognizes independent actions for negligent spoliation, *see Smith v. Atkinson*, 771 So. 2d 429, 432 (Ala. 2000), the LaFerreras are not making such a claim. Instead, they are relying on the evidentiary doctrine of spoliation that allows courts to impose sanctions on the spoliating party. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944–945 (11th Cir. 2005). Here, the LaFerreras are seeking two remedies. First, they want to preclude Defendants from relying on the June 19, 2014 release because the allegedly spoliated evidence might prove Defendants fraudulently induced them into signing the release. In the alternative, they ask for a "negative inference to conclude that the information concealed was damaging to Defendants' position that the June 19, 2014 letter release was obtained in this case due to fraud." (Doc. 71 at 6). However, the Court must first decide if any sanction is appropriate before deciding what sanction to impose. Second, they request a negative inference that Thor knew of certain defects during the Tuscany's manufacturing, which would relate to their misrepresentation during sale and concealment of nonconformities and defects claims.

In diversity cases, "federal law governs the imposition of spoliation sanctions." *Flury*, 427 F.3d at 944. Applying federal spoliation law is consistent with the general applicability of the Federal Rules of Evidence in diversity cases. *See id.* However, "[f]ederal law in this circuit does not set forth specific

guidelines," so courts have relied on state law for guidance insofar as they are "consistent with federal spoliation principles." *Id.* Alabama law defines spoliation as "an attempt by a party to suppress or destroy material evidence favorable to the party's adversary." *Wal-Mart Stores, Inc. v. Goodman*, 789 So. 2d 166, 176 (Ala. 2000). Importantly, a court may only draw an adverse inference from spoliation when the "absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Although bad faith does not require malice, "mere negligence in losing or destroying records is not sufficient to draw an adverse inference." *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

Notably, the LaFerreras did not file a motion to compel the production of the allegedly spoliated evidence. Instead, they waited until summary judgment to bring the Court's attention to the non-production. A motion to compel would have been more appropriate because it would have required the parties to confer in good faith and attempt to resolve their issues before bringing them to the Court's attention. At least in the case of the folder of information, which was produced after the LaFerreras moved for sanctions, a good faith attempt to resolve these problems would have obviated court involvement. However, the Court will address the merits of the spoliation claims.

### 1. Emails

The LaFerreras claim that an email from a chain of forwarded messages was not produced. They allege that these emails would be relevant to proving that they were fraudulently induced into signing the June 19, 2014 release, but they do not allege that the emails are related to their fraud claims concerning the purchase and repair of the Tuscany. The allegedly missing email was an email David Jones of Thor forwarded to other recipients. Jones's message—"Fyi your eyes only"—is produced, but underneath this message, the document only shows the sender, recipients, date, and subject of the forwarded email. As an initial matter, the Plaintiffs have not proven that the email was not produced. An email with the same sender, recipients, date, and subject as the blank forwarded email was produced in the same document.[7] The only difference between the two emails was the timestamp, which could be attributable to a number of reasons other than bad faith. For example, Phil Houser sent the allegedly missing email at 1:02 PM, but the document shows that David Jones forwarded that email at 12:29 PM the same day, which would be impossible. This discrepancy casts doubt into the accuracy of the

---

[7] The allegedly missing email reads, "From: Phil Houser / Date: 05/21/2014 1:02 PM (GMT - 05:00) / To: Sales Support, David Jones / Cc: Adam Gudger, Andrew VanSchoick / Subject: RE: LAFERRERA CONTACT." (Doc. 72-2 at 3). However, it does not show the text of the email. The same document shows an email that reads, "From: Phil Houser <phouser@tmcrv.com> / Sent: Wednesday, May 21, 2014 12:02 PM / To: Sales Support; David Jones / Cc: Adam Gudger; Andrew VanSchoick / Subject: RE: LAFERRERA CONTACT. / It's being handled. If you have specific questions please feel free to contact me." (Doc. 72-2 at 2).

timestamps altogether and indicates that the supposedly blank email is not in fact different from the email that was produced. Because these two emails are strikingly similar and the timestamps do not appear to be accurate, the Court doubts that a separate email existed.

However, even if an email existed and was not produced, the LaFerreras have not provided any evidence of bad faith or intent to destroy the email. Although the LaFerreras say that the emails were altered, they provide no proof beyond that allegation. They have not shown a system-wide email deletion or circumstantial proof of other clearly deleted emails, and they present no evidence showing whether the alleged spoliation occurred after the duty to preserve the emails arose. At most they argue that the alleged non-production occurred against the backdrop of other failures to produce discovery. In the absence of bad faith, the Court cannot grant an adverse inference based on the emails.

### 2. Dash Control Panel

The LaFerreras further argue that Thor did not preserve the dash control panel replaced when the Tuscany was in Indiana being repaired. However, the repair records (Doc. 80-4 at 15) show that the Freightliner Service Center replaced the dash control panel. The LaFerreras have failed to show that Thor or Camping World had custody or control of the panel after it was replaced or that they had a

duty to preserve it. Thus, they failed to show how that evidence was spoliated. The Court cannot grant the requested adverse inference. *See Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir.) (stating that an adverse inference is appropriate when a party does not produce evidence "within his control").

### 3.  Folder of Information

The LaFerreras argue that a folder of information that accompanied the Tuscany's unit history file was also spoliated. However, Thor produced those documents, (Doc. 80-4), and the Plaintiffs have not responded with any arguments as to how those documents affect the grant or denial of summary judgment in this case.

### 4.  Sealed Documents

The LaFerreras argue that Thor did not produce certain "sealed documents" that detail the Tuscany's inspection process. Based on this non-production, they want an adverse inference on their implied misrepresentation claims about defects that manifested during the manufacturing and inspection process. However, those claims arose before the June 19, 2014 release. As explained below, the release is valid, and any alleged spoliation of evidence relating to the released claims is irrelevant.

### C. June 19, 2014 Release

"[I]n the absence of fraud, a release supported by a valuable consideration, unambiguous in meaning, will be given effect according to the intention of the parties from what appears within the four corners of the instrument itself . . . ." *Cleghorn v. Scribner*, 597 So. 2d 693, 696 (Ala. 1992). Courts may not look at parol evidence if the terms of the release are unambiguous, absent a clear showing of fraud. *See Jehle-Slauson Const. Co. v. Hood-Rich Architects and Consulting Eng'rs*, 435 So. 2d 716, 720 (Ala. 1983). Additionally, if stated in the release, the parties can release causes of action they did not know about at the time. *See id.*; *Boles v. Blackstock*, 484 So. 2d 1077, 1082 (Ala. 1986).

However, a release will be invalid if a party was fraudulently induced into executing it. *See Cleghorn*, 597 So. 2d at 695. "A party who has been the victim of a misrepresentation of a material fact or the suppression of a material fact when there is a duty to speak upon which it reasonably relied *during negotiations* can claim fraud in the inducement." *Exxon Mobil Corp. v. Alabama Dept. of Conservation and Natural Res.*, 986 So. 2d 1093, 1129 (2007) (emphasis in original). Specifically, the fraud must "underlie the execution of the contract of release." *Jehle-Slauson Constr. Co.*, 435 So. 2d at 719 (quoting *Barbour v. Poncelor*, 83 So. 130, 133 (Ala. 1919)).

In this case, the parties executed a release on June 19, 2014 in which the

LaFerreras released Thor and Camping World

> from any and all contract, warranty, equity and statutory claims, demands, administrative proceedings and lawsuits of any kind arising prior to the date this letter agreement is signed relating to your purchase, ownership and use of the [Tuscany], including any claims based upon prior warranty repairs and the time taken to complete the same.

The parties agreed to release certain claims the LaFerreras might have had against the Defendants. However, the release is ambiguous about which claims were released. The parties appear to dispute the meaning of the phrase "arising prior to the date of this letter agreement" in the release. The Defendants argue that the release encompassed claims based on acts or omissions occurring before the release, even those the LaFerreras did not know about at the time. The LaFerreras assert that the release did not encompass claims they discovered the factual basis for after signing the release. The plain text does not unambiguously indicate which interpretation is correct. Alabama courts have addressed releases using similar language. *See Illinois Cent. R. Co. v. Johnston*, 87 So. 866, 867 (Ala. 1920) (addressing release saying, "arising in any manner . . . from or on account of personal injuries sustained by me on or about November 18th, 1913); *Jehle-Slauson*, 435 So. 2d at 718 (addressing release saying "arising directly or indirectly out of or in any manner related to work performed"); *Hampton v. Liberty Nat. Life Ins. Co.*, 706 So. 2d 1196, 1197 (Ala. Civ. App. 1996) (addressing release saying, "arising out

of any incident which may have occurred or damages which may be alleged . . . as a result of any act"). These cases demonstrate that many releases with similar language address claims "arising" from a specific act or omission, rather than claims arising before a certain date. Here, the parties' release did not address specific acts or omissions, with the exception of repair attempts. Thus, the parties' intent is not clear as to whether they intended to release claims based on acts occurring before June 19, 2014 or claims the LaFerreras knew about before June 19, 2014. Because the plain text of the release agreement does not provide any clarification, the Court finds that the phrase "arising prior" is ambiguous. *See Nunnelley v. GE Capital Info. Tech. Solutions-North America*, 730 So.2d 238, 241 (Ala. Civ. App. 1999) ("Whether a contract is ambiguous is a question of law for the trial judge.").

Despite this ambiguity, the release is effective for all claims the LaFerreras had reason to know of before they signed the release—including all valid misrepresentation claims, except for those dealing with the odometer discrepancy, and all valid suppression claims. Therefore, to the extent that the ambiguity is relevant, a question of material fact exists as to which claims were released. *Whitetail Dev. Corp. v. Nickelson*, 689 So.2d 865, 867 (Ala. Civ. App. 1996) ("When the terms of a contract are ambiguous in any way, however, the determination of

the true meaning of that contract is a question of fact for the finder of fact.").

Furthermore, the LaFerreras have not produced any evidence that they were fraudulently induced into signing the release. They first claim that the allegedly spoliated emails would have shown fraud, but the Court has rejected their spoliation argument. Further, they have not otherwise pointed to a misrepresentation regarding the release on which they relied to their detriment. At most, the LaFerreras might argue that their misrepresentation claims as to the purchase of the Tuscany might relate to the release. They claim that the Defendants promised that the Tuscany was new and would be defect free. However, the LaFerreras have not shown how they "reasonably relied during negotiation[]" of the release on these initial promises made eight months earlier. *Exxon Mobil*, 986 So. 2d at 1129. In fact, any potential reliance on a promise that the Tuscany was defect free is belied by the numerous problems the LaFerreras experienced. They took it in for repairs four times claiming several problems—showing that they knew long before signing the release that the Tuscany was not defect free. Therefore, the LaFerreras have failed to meet their burden to show fraud in the inducement with regard to the release.

### D. Misrepresentation and Suppression Claims

The LaFerreras make several interrelated misrepresentation and suppression

claims about the Tuscany. First, they claim that numerous defects manifested with the Tuscany during the manufacturing and inspection phase. They maintain that Thor attempted to repair these defects but did not disclose them to the LaFerreras. They claim that these repairs were so substantial that the Tuscany could not be considered new as it was represented to be. Second, they claim that Defendants at some point reset the Tuscany's odometer to show substantially fewer miles than it actually had. Third, they claim that Defendants represented to them that they repaired all of the problems with the Tuscany after every repair attempt, when, in actuality, the problems remained. Lastly, the LaFerreras' claim that Defendants failed to tell them that Thor's $5,000 contribution to the trade-in was made to obtain the release of liability for the Palazzo,[8] rather than to incentivize the trade. On the other hand, Defendants insist that the parties' June 19, 2014 agreement released all of these potential claims.

Misrepresentation requires a showing of "(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result." *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 465 (Ala. 2000) (quoting *Baker v. Bennett*, 603 So. 2d 928, 935 (Ala. 1992)); *see* Ala Code § 6-5-101. Suppression requires a showing "(1) that [the defendant] had a

---

[8] This is the release related to the Palazzo and is different from the June 19, 2014 release that related to the Tuscany.

duty to disclose the existing material fact; (2) that [the defendant] suppressed this material fact; (3) that [the defendant's] suppression of this fact induced [the plaintiff] to act or to refrain from acting; and (4) that [the plaintiff] suffered actual damage as a proximate result." *State Farm Fire and Casualty Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998); *see* Ala Code. § 6-5-102. Suppression differs from misrepresentation in that it is based on a party's silence on or concealment of a material fact, rather than a false statement about that material fact. *See Marshall v. Crocker*, 387 So. 2d 176, 179 (1980).

### i. Defects in Manufacturing and Inspection

The LaFerreras released their misrepresentation and suppression claims about the defects that manifested during manufacturing and inspection because they knew about those problems before they signed the release. These claims are based on problems that manifested when Thor employees inspected the Tuscany after manufacturing—including electrical issues, generator issues, water leakage, dishwasher problems, washing machine problems, windshield wiper malfunctions, and a scratched TV. Although Thor attempted to repair these issues before sending the Tuscany to Camping World, the LaFerreras experienced problems with the dash control panel, exposed wiring, the generator, the windshield leaking, and the alignment in or before December 2013. (Doc. 58-8 at 4–5, Brett LaFerrera Dep.

244:18–246:6). Further, in April 2014, the LaFerreras took the Tuscany to Camping World to repair the windshield wipers, the washing machine, the dishwasher, and electrical issues. (Doc. 58-8 at 9, Brett LaFerrera Dep. 264:7–18). Thus, the LaFerreras knew of a substantial number of problems that put them on notice that the Tuscany might not have been a "new" vehicle and that the Defendants might have known of the defects. As such, the release encompassed these claims.

### ii. Odometer Discrepancy

However, a question of fact remains about whether the LaFerreras released the claims about the alleged mileage discrepancy on the odometer. Brett LaFerrera stated that he did not know that the Tuscany was driven from Indiana to Alabama, that he read eight miles on the odometer when he bought it, and that he relied on the mileage reading during the purchase. The Defendants state that the odometer always reflected what they say is the correct mileage—despite the documents listing the mileage as eight—and that Brett LaFerrera could not have seen eight miles on the odometer. Additionally, Defendants say that Brett LaFerrera drove the Tuscany more than eight miles on his test drives. Accordingly, a question of fact exists as to whether the odometer reflected the actual mileage and whether Brett LaFerrera knew that the Tuscany had more than eight miles.

These questions of fact directly relate to whether Defendants misrepresented the mileage by resetting the odometer and listing eight miles on sales documents, which would support a claim of intentional misrepresentation. However, these facts do not support a suppression claim, which would require the Defendants' silence on or concealment of material facts. Here, Defendants were not silent about the mileage. They each listed eight miles on documents they gave to the LaFerreras. Thus, if the LaFerreras have a claim, it is based on a false statement of the mileage, not the failure to disclose the mileage.

### iii.  Representations About Repairs

The LaFerreras explicitly released "any claims based upon prior warranty repairs and the time taken to complete the same." This language demonstrates that the parties contemplated releasing claims based on repair attempts made before June 19, 2014. However, even if they had not released the claims, the LaFerreras failed to make out a claim for misrepresentation as to the repairs made before the release. They claim that the Defendants misrepresented to them that the Tuscany was fixed after every repair attempt. Yet, they have not provided evidence of any specific instances of problems, misrepresentations about repairs made, and the recurrence of those same problems, beyond saying, "they represented that it was fixed and that this was not true." (Doc. 76 at 25). Moreover, the LaFerreras have

not pointed to which Defendant allegedly made these assurances that the problems were fixed.

After the release, Thor attempted repairs in September 2014, including an attempt to repair the electrical issues. The LaFerreras say that the electrical problems were not fixed after this repair attempt. However, they state that a Thor or Camping World employee said that they could not guarantee that problem was fixed. Because they did not point the Court to a representation by a specific person claiming that the electrical problems were fixed, the LaFerreras misrepresentation claim as to this repair fails.

### iv. Palazzo Release

Lastly, the LaFerreras have not demonstrated that either Defendant was under a duty to tell them that Thor's contribution to the trade was in exchange, at least in part, for the Palazzo release. They have not shown a confidential relationship or other special circumstances giving rise to a duty. *See State Farm*, 729 So. 2d 834 (stating that a duty generally required a confidential relationship or other special circumstances). Additionally, the LaFerreras have not shown how they would have acted differently if they knew Thor's intent in making the contribution. They have not provided evidence showing they would not have traded the Palazzo in if they knew the $5,000 was given to obtain the release. In

fact, because they read and signed the release, they knew that Thor sought a release of claims related to the Palazzo, yet they proceeded with the transaction. Accordingly, they have failed to make out a claim of suppression based on these facts.

### E. Failure of Warranty

Generally, goods sold by merchants have an implied warranty of merchantability and, on some occasions, an implied warranty of fitness for a particular purpose. *See* Ala. Code §§ 7-2-314, 315. Sellers can disclaim these implied warranties if they follow certain statutory requirements. Ala. Code § 7-2-316. For the implied warranty of merchantability, if a disclaimer is in writing, it must mention merchantability and be conspicuous. *Id.* For the implied warranty of fitness for a particular purpose, the disclaimer must be in writing and conspicuous. *Id.* Additionally, "[u]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is.'" *Id.* However, a seller may not necessarily disclaim an express warranty in the same manner. When words or conduct tending to create an express warranty are negated by other words or conduct limiting such express warranty, they shall be construed as consistent when reasonable, but otherwise, the negation of the warranty shall be inoperative, subject to the parol evidence rule. *Id.* The parol evidence rule provides that "[t]erms . . .

set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Ala. Code § 7-2-202.

Further, sellers can limit the remedies available to a buyer for breach of warranty. For instance, a seller may limit them to repairing or replacing nonconforming goods or parts. *See* Ala. Code § 7-2-719. Alabama Courts have typically characterized such repair or replace warranties as express warranties. [9] *See Ag-Chem Equip. Co. v. Limestone Farmers Co-op., Inc.*, 567 So. 2d 250, 252 (Ala. 1990); *Lipham v. General Motors Corp.*, 665 So.2d 190, 192 (Ala. 1995); *DaimlerChrysler Corp. v. Morrow*, 895 So.2d 861, 865 (2004). However, when a warranty with an exclusive remedy fails its essential purpose, the buyer regains the statutory remedies, including consequential and incidental damages. *See* Ala. Code § 7-2-719; *Winchester v. McCulloch Bros. Garage, Inc.*, 388 So. 2d 927, 929 (Ala. 1980) (holding that Alabama does not uphold disclaimers of consequential and incidental damages when an exclusive or limited remedy fails its essential purpose). A repair or replace warranty fails its essential purpose if the warrantor refuses to

---

[9] Repair warranties are not the type of express warranties created under Ala. Code § 7-2-313, as they are not affirmations of fact relating to the goods. However, whether or not a repair warranty is properly called an express warranty, the LaFerreras have sufficiently alleged and argued that the warranty from Thor failed its essential purpose under Ala. Code § 7-2-719.

repair or replace the defect or does not repair or replace it within a reasonable time. *See Ag-Chem Equip. Co.*, 567 So. 2d 250 at 252.

Camping World effectively disclaimed any warranties in its agreement with the LaFerreras.[10] The agreement stated, "ALL VEHICLES ARE SOLD 'AS IS', WITH NO EXPRESS OR IMPLIED WARRANTIES," and additionally,

> I UNDERSTAND THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESS OR IMPLIED ARE EXCLUDED BY YOU FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE GOODS SOLD.

Further, it says, "This agreement contains the entire understanding between you and me and no other representation or inducement, verbal or written, has been made which is not contained in this contract." The LaFerreras did not respond to Camping World's argument that it did not adopt Thor's warranty, and they have not argued that the disclaimer of warranties does not meet the statutory requirements.[11] At one point, they argued that Camping World's disclaimer failed its essential purpose, but the "essential purpose" standard only applies to exclusive or limited warranties under Ala. Code § 7-2-719, not disclaimers made

---

[10] The LaFerreras have not argued that the odometer representations constituted an express warranty. Thus, the Court will not find a warranty claim that they have not argued.

[11] The writing states the Tuscany is sold "as is," and the additional disclaimers mention merchantability and are in conspicuous capital letters. Thus, the disclaimers appear to meet the statutory requirements. *See* Ala. Code § 7-2-316; *Fleming Farms v. Dixie Ag. Supply, Inc.*, 631 So. 2d 922, 927 (Ala. 1994) (holding disclaimer in all capital letters was conspicuous).

under Ala. Code § 7-2-316. Accordingly, because the parties intended the document to be a final expression of their agreement, as evidenced by the merger clause,[12] the Court cannot contradict the clear disclaimer of warranties with evidence of other representations allegedly made by Camping World, including any statements relating to the Gold Seal Inspection. Thus, any warranty claims against Camping World are due to be dismissed.

Moreover, Thor disclaimed all implied warranties[13] and stated in the warranty document that it was not making any express warranties about the quality of the Tuscany. Instead, it provided the exclusive remedy of repairing or replacing any defect in the workmanship or materials used, with a number of exceptions not relevant here. The LaFerreras argue that the Gold Seal Inspection brochure and assurances made by Camping World employees warranted that the Tuscany would be defect free. However, even if Thor made such a warranty, it would not provide a remedy additional to that provided in the limited warranty, which essentially obligated Thor to repair or replace any defect. Thus, the Court need not decide whether Thor warranted the Tuscany would be defect free.

Regardless, the LaFerreras argue that the electrical problems with the dash control panel persisted because a Thor or Camping World employee told them that

---

[12] The LaFerreras have not argued that the release was not a final expression of their agreement.

[13] The LaFerreras have not argued that the disclaimer is ineffective as to the implied warranties.

Thor could never isolate the problem.[14] Thor states that it repaired all defects with the Tuscany. Because the parties dispute whether this problem persisted, a question of fact exists as to whether the Tuscany had a defect. Furthermore, if it was defective, then another question of fact exists as to whether Thor failed to repair or replace the defect within a reasonable time and thus caused the warranty to fail its essential purpose. Accordingly, Defendants' Motion as to Thor's liability for a breach of the limited warranty is due to be denied.

### F.  Statute of Limitations

Thor argues that the LaFerreras' claims under the first warranty are untimely because they failed to bring them within ninety days of the end of the one year warranty period, which would have been on January 29, 2014. The statute of limitations for contracts of sale, including those with repair or replace warranties, is four years. *See* Ala. Code § 7-2-725; *Brown v. General Motors Corp.*, 14 So. 3d 104, 108 (2009). The parties may agree to reduce the limitations period, as long as it is not less than one year. In a typical breach of warranty case relating to the quality of the goods, the breach occurs, and thus the cause of action accrues, when tender of delivery is made. *See* Ala. Code § 7-2-725. However, a cause of action for a breach of a warranty obligating the warrantor to repair or replace defects accrues when the

---

[14] Defendants argue that this statement in hearsay, but because it is an opposing party's statement, it is excluded from hearsay. Fed. R. Evid. 801.

warrantor "breaches its contractual obligation to repair that good." *Brown*, 14 So. 3d at 113. Thus, the limitations period, whether contractual or statutory, begins to run when the warrantor fails to repair or replace a defect, rather than when tender of delivery is made. *See id.; American Suzuki Motor Corp. v. Burns*, 81 So. 3d 320, 325 (Ala. 2011).

The LaFerreras and Thor agreed to a one year repair or replace warranty, ending on October 31, 2014. The warranty agreement provided that any action brought to enforce it had to be brought by January 29, 2014. Because a cause of action accrues at the time a warrantor fails to repair or replace a defect, any breach that occurred less than one year before January 29, 2014 would necessarily have a limitations period of less than one year. Specifically, Thor returned the Tuscany to the LaFerreras on October 6, 2014 after making repairs. If the defect persisted after the repairs and caused the warranty to fail its essential purpose, then the LaFerreras had less than four months from the time of breach to bring their claim, making the limitations period less than one year. Thus, the parties' agreement to require actions for failure to repair be brought within ninety days of the end of the warranty is invalid in light of Ala. Code § 7-2-725. As a result, the statutory period of four years applies in this case, making the LaFerreras' warranty claims timely.

### G. Magnuson-Moss Warranty Act Claim

The MMWA, 15 U.S.C. §§ 2301–2312, is largely a disclosure statute that establishes certain requirements for written warranties. *See* 15 U.S.C. § 2302; *Cunningham v. Fleetwood Homes of Ga., Inc.*, 253 F.3d 611, 617 (11th Cir. 2001). In addition to its disclosure requirements, the MMWA provides a federal cause of action against a warrantor who fails to comply with an obligation under a written warranty, including an obligation to repair or replace a defect. *See* 15 U.S.C. § 2310; *Cunningham*, 253 F.3d at 617 n.5 (11th Cir. 2001). The parties do not dispute that the limited warranty provided by Thor is governed by the MMWA. Accordingly, because the LaFerreras have presented evidence that Thor failed to repair the electrical problems, they have a claim under the MMWA against Thor, and Defendants' Motion for Summary Judgment is due to denied as to the MMWA claim against Thor. However, Camping World did not provide a written warranty and did not adopt Thor's warranty. Thus, any MMWA claim against Camping World is due to be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is due to be DENIED as to the misrepresentation claims regarding the odometer against both Defendants and the breach of the limited warranty and MMWA claims against Thor. The Defendants' motion is due to be GRANTED as to all other

claims. Additionally, the LaFerreras Motion for Summary Judgment and Motion to Preclude Defendants' Argument, are due to be DENIED. Further, Defendants' Motion to Strike is MOOT. A separate order consistent with this opinion will be entered.

Done and Ordered this 21st day of March 2016.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

182185